IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

WALLACE BROWN,

          Plaintiff,

v.                                           Case No.  22-2084-JWB

FORDYCE CONCRETE COMPANY, INC. and
ASH GROVE MATERIALS CORP.,

          Defendants.

## MEMORANDUM AND ORDER

This matter is before the court on Defendants Fordyce Concrete Company, Inc. and Ash Grove Materials Corp.'s motion for summary judgment (Doc. 61).  The motion is fully briefed and ripe for decision.  (Docs. 62, 69, 73).  Defendants' motion is GRANTED for the reasons stated herein.

**I.**      **Facts**

Plaintiff Wallace Brown alleges Defendants Fordyce Concrete Company, Inc. ("Fordyce") and Ash Grove Materials Corp.[1] ("Defendants") violated Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981 by creating a racially hostile work environment, subjecting Plaintiff to race discrimination, and retaliating against him for engaging in protected activity by improperly disciplining him and terminating his employment.  (Doc. 60 at 16–17.)  The following facts are uncontroverted and deemed admissible.

---

[1] Defendant Fordyce Concrete Company Inc. is wholly owned by Ash Groves Materials Corp.  (Doc. 7 at 1.)

Plaintiff is African American. (Pl. Dep., Doc. 62-2 at 6:18–21.)  He drove a ready-mix truck and delivered concrete for Defendant Fordyce from July 31, 2019, to December 23, 2020. (*Id.* at 44:8–12; *see* Doc. 62-29 at 2.)[2]  Plaintiff alleges he learned about and experienced the following incidents of racial harassment and/or animus.

The first reported incident occurred in early September 2020, when a coworker, Doug Short, used a racial slur at work.[3]  (Pl. Dep., Doc. 62-2 at 105:22-106:15.)  Plaintiff did not hear Short use the racial slur because he was on vacation. (*Id.* at 91:21–25.)  Elijah Madison, a coworker who is a biracial, (*id.* at 96:12–13), told Plaintiff that Short used the word to refer to a third party. (*Id.* at 106:13.)  Plaintiff admitted he had never heard the slur used at Fordyce while employed there. (*Id.* at 89:2-5).  When Madison heard Short use the racial slur, he reported the issue to fellow driver and Union Steward, Scott Van Kam.  (*Id.* at 108:12–15.) The use of the slur by Short is the first alleged incident of racism.

Van Kam attempted to resolve the situation by having Madison and Short shake hands. (*Id.* at 108:14–15.)  Plaintiff disagreed with how Van Kam resolved the situation.  (*See id.* at 110:1–13.)  Plaintiff then spoke with Van Kam about how he had handled it.  (*Id.* at 110:23–25.)  Van Kam told Plaintiff he should not be involved because the issue was between Madison and Short. (*See id.* at 111:5–9.)  Plaintiff then explained to Van Kam that he was involved because whenever such a racial slur is used, it refers to all African Americans. (*Id.* at 111:10–13.)  Instead of agreeing

---

[2] The court notes that Plaintiff states in his deposition that his employment terminated around December 26, 2020, whereas Plaintiff's termination letter from Defendant Fordyce states his employment terminated on December 23, 2020.

[3] The parties describe the slur at issue as "the N-Word" throughout their briefs and elsewhere in the record.  The court interprets this as shorthand for the racial slur "nigger" or some variation thereof.  While that term is undoubtedly repugnant and offensive, litigation is sometimes an unsavory business.  Just as judges and juries are sometimes forced to hear and see evidence of reprehensible conduct in criminal cases, they may be required to do so in civil litigation as well.  Lawyers involved in such litigation need to have the courage to speak accurately about the challenged conduct, unpleasant as it may be.  Having clarified the court's understanding of what the parties intend by their use of the term "N-Word," the court will simply refer to it hereafter as a racial slur unless the context demands further detail or clarification.

with Plaintiff and further addressing the issue, Van Kam responded that he understands how Plaintiff feels because he dates African American women.  (*Id.* at 111:16–18.)  Plaintiff alleges Van Kam's statement about dating African American women is the second incident of racist conduct.

When Van Kam told Plaintiff about his understanding of the issue because he dates African American women, Plaintiff immediately called Scott Dungan, Fordyce Operations Manager (Dungan Dep., Doc. 62-3 at 7:2–6), to tell him that Short had used the racial slur and how Van Kam had handled the situation.  (Pl. Dep., Doc. 62-2 at 119:12–120:4.)  Dungan informed Plaintiff that it would be taken care of because racism is not tolerated at Fordyce.  (*Id.* at 119:18–21.)  However, in a second conversation between Plaintiff and Dungan, Dungan revealed that his father used to be a racist, (*id.* at 125:6–8), and Dungan discussed the use of such racial slurs in rap music, (*id.* at 126:3–6).  Plaintiff alleges that Dungan's statements to Plaintiff about his father's racism and the use of such racially offensive language in music is a third incident of racial animus.

The last two incidents of alleged racist conduct occurred around October 20, 2020.  The first incident occurred on the morning of October 20, 2020, when Plaintiff found a dead raccoon near his ready-mix work truck.  (*Id.* at 162:21–163:1.)  Later that day, Plaintiff alleges that the raccoon was staged to be looking directly at his truck with its claws in the air.  (*Id.* at 166:1–5.)  Plaintiff never took a photo of the raccoon when it was staged.  (*Id.* at 178:21–25.)  Around the same time, Plaintiff also found mud and concrete smeared onto his work truck. [4]  (*Id.* at 200:15–25.)

Around the same time in the fall of 2020, Plaintiff began calling in sick.  Dungan testified that he saw a pattern of Plaintiff calling in sick on Fridays and Mondays, and that there were a few

---

[4] Plaintiff does not recall when his truck was smeared with mud and concrete.  (Pl. Dep., Doc. 62-2 at 198:21–23.)

Saturdays when Plaintiff failed to attend work and did not inform someone that he would be absent. (Dungan Dep., Doc. 62-3 at 53:18–23.)  Plaintiff's absenteeism increased to once a week in October 2020.  (*See id.* at 53:5–25; *see* Doc. 62-20 at 2; Doc. 62-21 at 2.)  Dungan informed Plaintiff that if this continued, he would receive a written warning.  (Dungan Dep., Doc. 62-3 at 53:23–25.)  Eventually, Plaintiff received a written warning for excessive absenteeism on November 10, 2020.  (*Id.* at 55:5–8; Doc. 62-21 at 2.)  Plaintiff then filed a grievance with his union about this written warning.  (Dungan Dep., Doc. 62-3 at 56:4–6.)

A grievance meeting about Plaintiff's excessive absenteeism was held on December 3, 2020.  (Tucker Dep., Doc. 62-4 at 10:22–25.)  Robert Tucker, the general manager of Fordyce (*id.* at 5:2–7), Katie Richardson, a Human Resources Manager, and Scott Dungan attended this meeting.  (*Id.* at 11:9–13.)  During the grievance meeting, Plaintiff became physically agitated, raised his voice, and stood up and left the table.  (Dungan Dep., Doc. 62-3 at 60:8–19.)  When Plaintiff became agitated, Tucker ended the meeting, ostensibly for safety concerns.  (Tucker Dep., Doc. 62-4 at 13:16–20.)

Two different female employees also filed formal complaints of sexual harassment against Plaintiff.  (Doc. 62-23; Doc. 62-25.)  The first formal complaint contained the following allegations: Plaintiff attempted to show the woman pictures of himself in a bodybuilding bikini; discussed divorcing his wife because she was disrespectful towards him; attempted to coerce the woman to bring him treats at work; and the woman claimed that Plaintiff was fooling around instead of working.  (Doc. 62-23 at 2–3.)  The second formal complaint contained six allegations: (1) the complainant believed Plaintiff had been flirting with her, (2) he told her that her hair and jeans looked nice, (3) Plaintiff cornered her when she was in her truck and told her she was not treating him well, (4) Plaintiff showed the woman pictures of himself in a bodybuilding bikini, (5)

Plaintiff told the woman she had a "nice booty", and (6) Plaintiff commented on and stared at a hole in her jeans near her upper thigh. (Doc. 62-25 at 2.) Katie Richardson testified in her deposition that when she spoke with both women about their allegations, they occasionally struggled to speak about what had occurred. (Richardson Dep., Doc. 62-14 at 125:25–126:6, 126:15–22.)

Additionally, Plaintiff received a written warning for violating Defendant's COVID-19 protocols when he hugged a male co-worker from behind. (Doc. 62-27; Doc. 62-26 at 2.) The co-worker, whom Defendant hugged from behind, reported to Richardson that he was surprised when Plaintiff hugged him, that he did not want to be hugged by Plaintiff, and that he did not grant permission to Plaintiff to touch him. (Doc 62-26 at 2.) Plaintiff was aware that COVID-19 was a concern when he hugged his co-worker from behind. (Pl. Dep., Doc. 62-2 at 242:14–24.) Plaintiff received a written warning for this incident on December 9, 2020. (Doc. 62-27 at 2.)

On December 16, 2020, Defendant formally suspended Plaintiff to investigate the complaints against him for sexual harassment and for violating COVID-19 policies. (Doc. 62-28 at 2.) The associated suspension letter also set a meeting to discuss these violations on December 22, 2020, where Plaintiff, Plaintiff's union representatives, and Defendant Fordyce's representatives would be present. (*Id.*)

Richardson and Dungan attended the December 22 meeting on behalf of Fordyce. (Dungan Dep., Doc. 62-3 at 70:3–13.) At the meeting, Plaintiff admitted to showing pictures of himself in bodybuilding bikini underwear to male and female coworkers and specifically to one of the female coworkers who filed a sexual harassment complaint against him. (Doc. 70-14 at 1; Pl. Dep., Doc. 62-2 at 288:3–5, 289:24–1.) Plaintiff not only acknowledged showing pictures of himself in bikini underwear to female coworkers, but he explained to Richardson that there was nothing wrong with

him doing this.  (Doc. 70-14 at 2.)  When Richardson raised the issue of complimenting female coworkers on their appearances, Plaintiff responded by commenting on her appearance. (Richardson Dep., Doc. 62-14 at 123:20–23; Doc. 70-14 at 2.)  Richardson did not want Plaintiff commenting on her appearance, and she struggled during the meeting because he repeatedly did so.  (Richardson Dep., Doc. 62-14 at 124:3–5.)  Plaintiff also told Richardson that there was nothing wrong with complimenting female coworkers about their appearance, (Doc. 70-14 at 2), and claimed it was his perspective/intent that mattered for determining whether his statements were inappropriate.  (Richardson Dep., Doc. 62-14 at 123:24–124:2; Doc. 70-14 at 2.)  Richardson also recorded in her notes that Plaintiff became agitated in this meeting and raised his voice.  (Doc. 70-14 at 3.)

Plaintiff also admitted to hugging the male co-worker from behind, the conduct that violated Defendants' COVID-19 policies.  (*Id.* at 3.)  Plaintiff acknowledged he did not ask permission to hug this co-worker, but then claimed that he did not need permission because they were friends.  (*Id.*)

Richardson reported to Tucker that Plaintiff was both unapologetic and had been commenting on her appearance during the meeting.  (Richardson Dep., Doc. 62-14 at 32:8–14.) Richardson recommended Plaintiff's employment be terminated. (Tucker Dep., Doc. 62-4 at 33:2–3.) Tucker agreed, (*id.* at 33:2–13), and Defendants officially terminated Plaintiff's employment on December 23, 2020 for violating Defendants' "Company policies including but not limited to the Code of Business Conduct and Harassment."  (Doc. 62-29 at 2.)

## II.     Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R.

Civ. P. 56(a).  A fact is "material" when it is essential to the claim, and the issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor.  *Haynes v. Level 3 Commc'ns*, 456 F.3d 1215, 1219 (10th Cir. 2006).  The court views all evidence and reasonable inferences in the light most favorable to the nonmoving party.  *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

In considering a motion for summary judgment, the facts set forth in the motion must refer "with particularity to those portions of the record upon which" the moving party relies.  D. Kan. R. 56.1(a).  "All material facts set forth in the statement of the movant will be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of the opposing party."  *Id.*  To properly dispute a proposed statement of material fact, the opposing party must "refer with particularity to those portions of the record upon which the opposing party relies." D. Kan. R. 56.1(b)(1).  Failure to properly controvert a proposed fact that is properly supported will result in a determination that the fact is admitted.  *Coleman v. Blue Cross Blue Shield of Kansas, Inc.*, 287 F. App'x 631, 635 (10th Cir. 2008) (finding that the "district court was correct to admit all facts asserted in Blue Cross's summary judgment motion that are not controverted by a readily identifiable portion of the record.") (internal quotation and citation omitted).

## III.  Analysis

### A.  Hostile Work Environment

Plaintiff asserts he was subject to a racially hostile work environment.  Defendants argue they are entitled to summary judgment because Plaintiff cannot establish a prima facie case.

Whether a plaintiff brings a racially hostile work environment claim under § 1981 or Title VII, the "same substantive standards apply."  *See Lounds v. Lincare*, Inc., 812 F.3d 1208, 1221 (10th Cir. 2015).  Under both Title VII and § 1981, the burden shifting approach established in

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), is the "overarching" analytical framework applied to these claims. *Lounds*, 812 F.3d 1208, 1221. Under the *McDonnell Douglas* framework, the plaintiff carries the initial burden of establishing a prima facie case of a hostile work environment. *See id.* To do so, a plaintiff must demonstrate (1) he is a member of a protected group, (2) he was subject to unwelcome harassment, (3) the harassment was based on race, and (4) the harassment was pervasive or severe enough to alter the terms, conditions, or privilege of employment and created an abusive work environment. *Owens v. Unified Gov't of Wyandotte Cnty./Kansas City, Kansas*, No. CV 21-2185-KHV, 2022 WL 2131117, at *14 (D. Kan. June 14, 2022) (citing *Lounds*, 812 F.3d at 1222).

Here, Defendants argue Plaintiff has not established (1) the alleged harassment was so pervasive or severe that it altered the terms and conditions of his employment, and (2) that the alleged harassment occurred because of Plaintiff's race. (Doc. 62 at 21, 23.)

1. *Whether the Harassment was Pervasive or Severe Enough to Alter Employment Terms and Conditions*

A plaintiff may establish that the harassment altered the terms and conditions of his employment via two independent and equal grounds: (1) the pervasiveness of the harassment, or (2) the severity of the harassment. *See Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1143 (10th Cir. 2008); *See Witt v. Roadway Express*, 136 F.3d 1424, 1432 (10th Cir. 1998). Additionally, the work environment must be subjectively and objectively hostile. Hence, a court cannot only consider a plaintiff's assessment of the pervasiveness and severity of the harassment. Rather, it must determine if a reasonable employee would deem the intimidation, ridicule, and insult sufficiently severe or pervasive to create a hostile environment. *See Brown v. LaFerry's LP Gas Co.*, 708 F. App'x 518, 520–21 (10th Cir. 2017). (quoting *Lounds*, 812 F.3d at 1222.)

As such, courts must analyze hostile work environment claims with a holistic approach, assessing the pervasiveness and severity of the harassment under the totality of the circumstances to determine if it objectively altered the terms, conditions, and privileges of the plaintiff's employment. *See id.*

    a. Pervasiveness

The pervasiveness inquiry is not merely quantitative. Although it requires a factfinder to consider the number of times racially charged harassment and conduct occurred, a factfinder must also consider the discriminatory conduct in its the broader context—bearing in mind the environment of where it occurred as well as the sequence and timing of it. *See Smith v. Nw. Fin. Acceptance, Inc.*, 129 F.3d 1408, 1415 (10th Cir. 1997). The Tenth Circuit has also determined there is "no talismanic number of incidents needed to give rise to a hostile discrimination claim." *Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1143 (10th Cir. 2008).

In *Herrera v. Lufkin Industries*, Inc., 474 F.3d 675 (10th Cir. 2007), the court concluded that the plaintiff's work environment was permeated with racial discrimination, ridicule, and insult such that it was sufficiently *pervasive* to alter the plaintiff's conditions of employment. The court came to this conclusion because the plaintiff endured both discrete/isolated instances of racial harassment and a constant barrage of racial animus. *Id.* at 680. For example, when the plaintiff first met one of his supervisors, the supervisor refused to shake the plaintiff's hand because he was Hispanic. *Id.* The plaintiff also received a gift from this supervisor with a note that contained the following racist description: "Mexican peanut brittle." *Id.* This same supervisor also made the plaintiff speak to Hispanic customers, *id.* at 681, and summoned the plaintiff by saying "Spanish lover, come here." *Id.* In addition, the supervisor told the plaintiff not to "Mexicanize" his truck by adding chrome and hanging dice from the rearview mirror. *Id.* The plaintiff in that case also

endured ongoing racial enmity throughout his four-year tenure with the defendant employer. *Id.* The court discussed how his supervisor referred to him as "the Mexican" or "the fucking Mexican" when speaking about him to coworkers (this occurred every two to three days). *See id.* at 681. Thus, *Herrera* demonstrates that racial conduct sufficiently pervasive to create a hostile work environment can occur where a person endures discrete and isolated instances of racial animus coupled with an ongoing barrage of racially charged conduct.

By contrast, when plaintiffs merely allege a few isolated instances of racial harassment, courts have been reluctant to find they have satisfied the pervasiveness inquiry. For example, in *Brown v. LaFerry's LP Gas Co.*, 708 F. App'x 518, 521 (10th Cir. 2017), the plaintiff based his hostile work environment claim on three racially charged comments made throughout a period of six months. *See id.* The court concluded three comments within six months fell short of the pervasiveness standard. *Id.* at 522. Likewise, in *Bolden v. PRC Inc.*, 43 F.3d 545 (10th Cir. 1994), the court determined that two overtly racial remarks made by separate employees did not satisfy the pervasive standard either. *Id.* at 551. Furthermore, in *Al-Kazaz v. Unitherm Food Sys.*, Inc., 594 F. App'x 460, 463 (10th Cir. 2014), the court addressed whether three racial comments made in a two-month period constitutes "continuous" harassment that satisfies the pervasive standard. *Id.* at 463. The court concluded it did not despite the instances occurring relatively close together. *See id.*

Drawing upon the differences between *Herrera* and *Brown*, *Bolden*, and *Al-Kazaz*, the court concludes Plaintiff's allegations are different from *Herrera* and akin, or even less severe, to those in *Brown*, *Bolden*, and *Al-Kazaz*.

First, the events leading to Plaintiff's claim occurred over two months. In *Herrera*, the plaintiff endured racial harassment for four years, whereas, similar to Plaintiff, the plaintiffs in

*Brown* and *Al-Kazaz* experienced instances of racial animus over two to six months. Second, Plaintiff alleges only five discrete instances of racial enmity and conduct—not discrete instances coupled with racially-charged conduct occurring every few days like the plaintiff in *Herrera*. Plaintiff alleges the first instance occurred in early September of 2020, when he was not present but he heard that a co-worker used a racial slur in front of a biracial co-worker. (Pl. Dep., Doc. 62-2 at 105:22-106:15.) No date is provided, but the second instance occurred later in September, when Plaintiff approached Scott Van Kam, a fellow driver and Union Steward, about the racial slur situation and Van Kam responded that he understood Plaintiff's concerns because he dates black women. (*Id.* at 111:16–18.) There is no date for the third instance either, when Plaintiff spoke to his supervisor, and the supervisor told Plaintiff about his father's racism and the use of racial slurs in rap songs. (*Id.* at 126:3–6.) The last two incidents occurred on and around October 20, 2020: (1) Plaintiff claims his coworkers staged a dead racoon near his parking spot, so when he pulled into the spot, it would be directed at him, (*id.* at 166:1–5), and (2) Plaintiff alleges his coworkers smeared his work truck with mud or concrete, (*id.* at 200:15–25).

These five allegedly racist incidents were isolated and discrete. Plaintiff also endured these intermittent and isolated instances of racial conduct over the course of seven to eight weeks, a timeline similar to the plaintiffs in *Brown*, *Bolden*, and *Al-Kazaz*. Racial harassment did not occur every two to three days, nor even weekly. Plaintiff may have experienced more instances of racial harassment than the plaintiffs in *Brown*, *Bolden*, and *Al-Kazaz,* but unlike those plaintiffs, Defendants or Defendants' employees never called Plaintiff racist names or terms directly to his face. Indeed, Plaintiff's first alleged incident of racial harassment occurred when he was not even present. Nor does Plaintiff allege that he endured a steady barrage of racist comments or conduct. Due to the infrequency, the court concludes that unlike the plaintiff in *Hererra*, Plaintiff endured

racial harassment similar to, or even less than, the plaintiffs in *Brown*, *Bolden*, and *Al-Kazaz*. Accordingly, as the courts decided in *Brown*, *Bolden*, and *Al-Kazaz*, an objective person in Plaintiff's position would not find that Defendants' conduct was sufficiently pervasive to alter his employment conditions.

b. Severity

As discussed above, over seven to eight weeks, Plaintiff endured five *isolated* incidents of racial animus/harassment. Because he experienced isolated instances of racial enmity, Plaintiff must demonstrate that these isolated incidents were "especially egregious or extreme" or "threatening and severe" to succeed under the severity standard. *See Morris v. City of Colorado Springs*, 666 F.3d 654, 667 (10th Cir. 2012).

Under Tenth Circuit precedent, "threatening and severe" and "especially egregious or extreme" isolated incidents typically involve physical assault, *see Brown v. LaFerry's LP Gas Co.*, 708 F. App'x 518, 522 (10th Cir. 2017) (citing *Morris v. City of Colorado Springs*, 666 F.3d 654, 667 (10th Cir. 2012) (discussing caselaw that involves what is considered egregious isolated instances because they involve physical touching)), or the cumulation of racist conduct that concludes with a clear threat, *see Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1144 (10th Cir. 2008) (discussing how repeated racial epithets that concluded with a life-size hangman's noose directed toward African American coworker creates a hostile environment). In cases where courts have found physical assault to be egregious and extreme, the conduct typically goes beyond a minor battery tort claim. Instead, the physical touching is often sexual in nature. *See e.g., Turnbull v. Topeka State Hosp.*, 255 F.3d 1238, 1242–43 (10th Cir. 2001) (Plaintiff was digitally raped and physically assaulted by a patient); *see Lockard v. Pizza Hut*, Inc., 162 F.3d 1062, 1072 (10th Cir.

1998) (two male customers grabbed a female plaintiff's hair and breast, which he put into his mouth).

Here, Plaintiff does not claim he endured anything near what the plaintiffs in *Turnbull* and *Lockard* experienced.  The only physical conduct alleged by Plaintiff occurred when his coworkers allegedly smeared mud and concrete on his work truck; but that merely involved physical contact to property under Plaintiff's control, not to his own body.  Moreover, as discussed by the court in *Brown*, a racially hostile work environment claim needs to be based on conduct that is "racial or motivated by racial animus."  708 F. App'x 518, 522 (10th Cir. 2017).  In *Brown*, the court distinguished between retaliatory conduct from coworkers and racist conduct by coworkers.  *Id.* The court explained that retaliatory conduct that results from a plaintiff's complaint to management about racial animus is not discriminatory conduct.  *Id.*  In other words, there is a difference between retaliation and discrimination.  *See id.*  Plaintiff in this case does not provide evidence that his coworkers smeared mud on his truck because of his race.  Rather, Plaintiff's own statement of the facts suggest his coworkers smeared mud on his truck in retaliation for Plaintiff complaining about how union steward Scott Van Kam handled the situation involving the racial slur. (Doc. 69 ¶¶ 11–12.)

Plaintiff has failed to demonstrate that his work environment was similar to the plaintiff's in *Tademy* either.  In *Tademy*, the plaintiff endured years of racist conduct where, for example, plaintiff found racial slurs etched onto his locker, racist cartoons posted onto the company's billboards, and derogatory statements made about social situations.  614 F.3d at 1135–1137.  This racist animosity culminated in a life-threatening gesture: plaintiff discovered a life-sized noose, which caused a visceral reaction where he became nauseous and vomited.  *Id.* at 1137.  From an

objective perspective, the court concludes that Plaintiff did not endure an environment on par with the plaintiff in *Tadmey*.

Because Plaintiff failed to satisfy both the pervasive and severity inquiries, this court does not reach the question of whether the alleged harassment was motivated by race. As such, Defendant's motion for summary judgment on Plaintiff's race-based hostile work environment claims under Title VII and § 1981 is granted.

### B.  Racial Discrimination

The court notes that it has already determined that racial discrimination under Title VII and § 1981 have the same elements.  *Glenn v. P1 Grp., Inc.*, No. 22-2121-JWB, 2023 WL 3019661, at *5 (D. Kan. Apr. 20, 2023).  Thus, the claims are addressed together.

When a plaintiff relies on circumstantial evidence to support his racial discrimination claim under Title VII and § 1981, the claim is analyzed under the *McDonnell Douglas* burden shifting framework. *See Amro v. Boeing Co.*, 232 F.3d 790, 796 (10th Cir. 2000).  Here, all parties proceed under the *McDonnell Douglas* framework.  (Docs. 62 at 28, 69 at 22.)  Accordingly, the court will proceed in the same manner as the parties and analyze the claim under *McDonnell Douglas*.

Under the *McDonnell Douglas* framework, Plaintiff carries the initial burden of establishing a prima facie case of racial discrimination under Title VII and § 1981.  *Amro*, 232 F.3d at 796.  If the plaintiff establishes a prima facie case, the burden shifts to the defendant "to articulate a legitimate, nondiscriminatory reason for the discharge . . . ." *Argo v. Blue Cross & Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1201 (10th Cir. 2006).  If a defendant proffers a legitimate, nondiscriminatory reason, the burden shifts back to the plaintiff to demonstrate that "the stated reason is pretextual."  *Id.*

Plaintiff must satisfy the following elements to establish a prima facie case of race discrimination: "(1) he belongs to a protected class; (2) he suffered an adverse employment action; and (3) the challenged action took place under circumstances giving rise to an inference of discrimination." *Glenn*, 2023 WL 3019661, at *6 (citing *Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 627 (10th Cir. 2012)).

Unlike Plaintiff's hostile work environment claim, Defendants do not dispute Plaintiff's racial discrimination claim at the prima facie stage.  (Doc. 62 at 30.)  Instead, Defendants claim Plaintiff cannot establish that Defendants' stated reason for terminating his employment was pretextual.  (*Id.*)

Defendants argue that they terminated Plaintiff's employment for legitimate, nondiscriminatory reasons: namely, because Plaintiff admitted to conduct that violated their harassment policy.  (*Id.* at 30.)  More specifically, Defendants argue they terminated Plaintiff's employment because in the December 22 meeting, Plaintiff admitted to violations that amounted to showing inappropriate pictures of himself in bikini underwear to female coworkers, commenting on female coworkers' appearances, and when he was confronted about these allegations, demonstrated no remorse and attempted to justify his conduct by making comments about Katie Richardson's appearance—the Human Resources Manager who conducted the meeting and asked Plaintiff about the alleged conduct.[5]  (*Id.*)  Moreover, these stated reasons do not conflict with Plaintiff's termination letter from Defendants, which states that Defendants "terminated [Plaintiff's] employment for violation of Company policies including but not limited to the Code

---

[5] Defendants also allege that they terminated Plaintiff's employment because he violated COVID-19 protocols. (Doc. 62 at 30.)  However, upon review of the evidence, the court cannot definitively determine that Plaintiff's COVID-19 Protocol violation factored into their ultimate decision to terminate his employment.  This determination does not affect the court's finding of no pretext.

of Business Conduct and Harassment." (Doc. 62-29 at 2.) After reviewing the evidence, the court finds Defendants have met their burden on this point.

Nevertheless, a plaintiff can establish pretext in multiple ways. He can do so by demonstrating that "'the defendant's stated reason for the adverse employment action was false.'" *Glenn*, 2023 WL 3019661 at *6 (quoting *Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1150 (10th Cir. 2011)). Pretext may also be established by "showing . . . such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Lobato v. New Mexico Environment Dept.*, 733 F.3d 1283, 1289 (10th Cir. 2013) (quoting *Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1323 (10th Cir. 1997)). The discriminatory motive need not be the sole reason for a plaintiff's firing either, but a plaintiff must demonstrate that it was a determining factor. *See Carter.*, 662 F.3d at 1149. However, it is important to note that a "plaintiff's subjective evaluation of the situation" is not the basis of the analysis; rather, the perspective of the defendant or person making the employment decision forms the basis of the analysis. *Lobato*, 733 F.3d at 1289. Moreover, the inquiry focuses on whether the defendant "honestly believed those reasons and acted in good faith upon those beliefs." *Id.*

Here, Plaintiff raises three arguments as to why Defendants' proffered reasons for terminating his employment (i.e., violating the company's harassment policy) are pretextual. (Doc. 69 at 24.) He argues that he was treated differently during the investigation of his alleged violations of Defendants' harassment policy than another employee who was also investigated and terminated for violating Defendants' harassment policy. (Doc. 69 at 25.) Plaintiff also alleges Defendants could not reasonably believe that the sexual harassment and physical touching

complaints were anything other than retaliatory, and that Defendants could not believe Plaintiff's conduct actually violated Defendants' harassment policy.  (*Id.* at 26.)  Lastly, Plaintiff argues that Defendants' proffered reason for his termination is pretextual because they altered their reason for terminating his employment.  (*Id.* at 29.)

As to Plaintiff's first argument, Plaintiff alleges Defendants treated him differently from Doug Short, who used the racial slur and was terminated for that conduct. (Doc. 69 at 25.)  Plaintiff acknowledges that both he and Short were terminated for violating Defendants' harassment policy. (*Id.*)  However, Plaintiff claims they were treated differently during the investigation into their respective violations of the harassment policy.  (*Id.*)  The only difference Plaintiff identifies is the amount of time it took Richardson to notify him of the investigation and suspend him from work pending the investigation.  (*Id.* at 25–26.)  Plaintiff claims Defendants did not notify him of the investigation for 34 days, whereas they notified Short within a couple of days.  (*Id.*)  Plaintiff also argues that he was not suspended for an additional 30 days, whereas Short was suspended within 9 days after he received notice of the complaint.  (*Id.*)  Plaintiff takes issue with the difference in timing because during the period in which he was under investigation but did not know it, he commented on a female coworker's appearance, who afterward lodged a formal complaint against him.  (*Id.*)  Although Plaintiff is not explicit, his brief suggests that he is arguing that had he known he was under investigation, he would not have commented on the coworker's appearance.  Or alternatively, Plaintiff is suggesting that had Defendants suspended him, he would not have had the chance to make this comment.

However, a difference in treatment that is "trivial or accidental or explained by a nondiscriminatory motive will not sustain a claim of pretext*." Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1232 (10th Cir. 2000).  Moreover, the difference in treatment must have

uniquely disadvantaged the minority plaintiff. *See Cox v. Lockheed Martin Corp.*, 545 Fed. Appx. 766, 773 (10th Cir. 2013).  Plaintiff's argument that the difference in treatment between him and Short demonstrates pretext is conclusory.  He cites no case law indicating a difference in the amount of time it takes a human resources agent to notify similarly situated parties about an investigation and suspend those parties during that investigation amounts to more than a trivial difference in treatment.   Second, although Plaintiff may argue his treatment uniquely disadvantaged him because he unwittingly approached a female coworker and violated company policy by commenting on her appearance during the investigation period, Plaintiff's argument fails because the evidence demonstrates he does not believe commenting on female coworkers' appearances is wrong.  (*See* Tucker Dep., Doc. 62-4 at 33:8–13; *see* Richardson Dep., Doc. 62-14 at 123:20–23.)  In fact, after learning that commenting on their appearances is inappropriate, Plaintiff doubled down on his conduct by commenting on Richardson's appearance, the female human resources manager who conducted the December 22 meeting.  (Richardson Dep., Doc. 62-14 at 123:20–23; Doc. 70-14 at 2.)  Hence, Plaintiff's suggestion that he made the comment unwittingly because he did not know about the investigation is completely contradicted by his own conduct in the face of clear direction that such comments violated company policy.  Therefore, the court does not find that Plaintiff was treated differently than Doug Short; both were terminated for violating Defendants' harassment policy and any difference in treatment during their respective investigations was trivial.

Plaintiff's second argument is that Defendants could not have honestly believed their reasons for terminating his employment.  This argument is also unavailing because of the following uncontroverted evidence.

First, two female employees submitted formal complaints against Plaintiff for sexual harassment.  (Doc. 62-23; Doc. 62-25.)  Richardson received the first formal complaint on October 13, 2020.  (62-23 at 2.)  It contained the following allegations: Plaintiff attempted to show the woman pictures of himself in a bodybuilding bikini; discussed divorcing his wife because she was disrespectful towards him; attempted to coerce the woman to bring him treats at work; and the woman claimed that Plaintiff was fooling around instead of working.  (Doc. 62-23 at 2–3.)  The second woman filed a formal complaint against Defendant for sexual harassment on November 16, 2020.  (Doc. 62-25 at 2.)  The second woman had six complaints against Plaintiff: (1) she believed Plaintiff had been flirting with her, (2) he told her that that her hair and jeans looked nice, (3) Plaintiff cornered her when she was in her truck and told her she was not treating him well, (4) Plaintiff showed the woman pictures of himself in a bodybuilding bikini, (5) Plaintiff told the woman she had a "nice booty", and (6) Plaintiff commented on and stared at a hole in her jeans near her upper thigh.  (Doc. 62-25 at 2.)  Richardson testified in her deposition that both women struggled or had to regain their composure when reporting their sexual harassment claims against Plaintiff.[6]  (Richardson Dep., Doc. 62-14 at 125:25–126:6, 126:15–22.)

Second, when Defendants attempted to address the sexual harassment claims, Plaintiff showed no remorse or understanding that his conduct was wrong.  Defendants arranged a meeting on December 22, 2020, to discuss with Plaintiff the claims against him of sexual harassment and the unwanted touching of his coworker that led to the COVID-19 policy violation. (Doc. 62-28 at 2; Doc. 70-14 at 3.)  During this meeting, Plaintiff was unapologetic and failed to understand the problems with his conduct regarding the comments and conduct toward female coworkers.

---

[6] Plaintiff admits there were two sexual harassment complaints submitted against him, but he controverts some of the substance in the claims.  However, the court concludes Plaintiff's controverting some of the claims is immaterial because he admitted to harassing coworkers by showing pictures of himself in a body building bikini and showed no remorse for commenting on female coworkers' appearances.

Plaintiff admitted in his deposition to showing pictures of himself in a bodybuilding bikini to one of the women who filed a sexual harassment complaint and to other employees.  (Doc. 70-14 at 2.)  Plaintiff not only acknowledged showing pictures of himself in a bodybuilding bikini to female coworkers, but he explained to Richardson that there was nothing wrong with him doing this.  (*Id.*)  When Richardson raised the issue of commenting on female coworkers' appearances, Plaintiff showed no remorse or concern for his conduct.  (Richardson Dep., Doc. 62-14 at 123:20–23; Doc. 70-14 at 2.)   In fact, he defended his conduct by commenting on Richardson's appearance.  (Richardson Dep., Doc. 62-14 at 124:3–5; Doc. 70-14 at 2.)  Richardson testified in her deposition that she did not want Plaintiff commenting on her looks, and that she struggled during the meeting because he consistently made comments about her appearance.  (Richardson Dep., Doc. 62-14 at 124:3–5.)  Plaintiff also told Richardson that whether his conduct was wrong depended on his perspective—not the person whom he was commenting about.  (Richardson Dep., Doc. 62-14 at 123:24–124:2; Doc. 70-14 at 2.)  Moreover, Plaintiff became agitated during this meeting as well, which contributed to Richardson feeling uncomfortable.  (Doc. 70-14 at 3.)

After the December 22 meeting, Richardson reported to Tucker that Plaintiff was unapologetic for his comments to female coworkers and that he had been commenting on her appearance throughout the meeting.  (Tucker Dep., Doc. 62-4 at 31:3–32:14.)   Richardson recommended termination because Plaintiff admitted he showed pictures of himself in a bodybuilding biking, admitted he made comments to female coworkers about their appearances, made comments about Richardson's appearance during the meeting, and because Plaintiff showed no remorse for his conduct.  (*Id.* at 29:2–32:14, 33:2–13.)  Tucker agreed with Richardson that termination was appropriate.  (*Id.* at 33:2–13.)

Taking into consideration these uncontroverted facts, the court concludes Defendants acted in good faith and honestly believed they terminated Plaintiff's employment for violating company policy.  Importantly, whether a defendant honestly believed its reason for terminating an employee guides the analysis—not a plaintiff's *subjective* evaluation of the situation.  *See Lobato*, 733 F.3d at 1289.  As such, although Plaintiff may disagree with the outcome, Defendants were the parties dealing with Plaintiff, who admitted to conduct that violated Defendants' harassment policy and showed no remorse or understanding as to why his conduct was wrong.  (Tucker Dep., Doc. 62-4 at 33:2–13.)  For these reasons, Richardson recommended termination and Tucker agreed.  (*Id.*)  Plaintiff's termination letter stated that he was fired "for violation of Company policies *including but not limited to* the Code of Business Conduct and Harassment."  (Doc. 62-29 at 2.)  Thus, the evidence indicates Defendants terminated Plaintiff's employment for the reasons stated and did so in an honest manner after meeting and discussing the allegations with Plaintiff.

Plaintiff's third argument also fails.  Plaintiff argues that Defendants have been inconsistent with their reasons for terminating his employment, and as such, the court should find Defendants' proffered reasons as pretext.  Plaintiff alleges Defendants were inconsistent because their supplemental answer to interrogatory number 6 differed from their response to the Equal Employment Opportunity Commission ("EEOC") and their original answer to interrogatory number 6.  (Doc. 69 at 29 (referring to Plaintiff's statement of facts ¶ 54).)  In Defendants' response to the EEOC and in their answer to interrogatory number 6, Defendants claimed they terminated Plaintiff's employment because he violated company policy, which included its code of conduct, harassment policy, and COVID-19 protocols/policy.  (Doc. 70-8 at 3; Doc. 70-9 at 3.)  Plaintiff alleges this language differs from Defendants' supplemental answer to interrogatory number 6, where Defendants stated Plaintiff's employment was terminated because he violated the Code of

Business Conduct and Harassment.  (70-2 at 15.)  Plaintiff claims this inconsistency is evidence of pretext because Defendants dropped the COVID-19 violations from the explanation.  (Doc. 69 at 29.)

However, in *Smith v. Oklahoma ex rel. Tulsa Cnty. Dist. Att'y*, 245 F. App'x 807, 817 (10th Cir. 2007), the Tenth Circuit explained that when the inconsistency arises from a more detailed explanation for the termination and is not one of many *new* reasons for termination, the inconsistency does not support a finding of pretext.  *See id.*  Defendants do not controvert that they did not use the same language in their supplemental answer to interrogatory number 6, (Doc. 73-2 at 15), but that does not mean they have been inconsistent with why they terminated Plaintiff's employment.  Plaintiff's termination letter from Defendants stated that Plaintiff's employment was terminated "for violation of Company policies *including but not limited to* the Code of Business Conduct and Harassment."  (Doc. 62-29 at 2.)  Although Defendants may not have explicitly listed violation of COVID-19 protocols in the letter, the letter included language that was broad enough to encompass violations of its COVID-19 policies.  Moreover, Tucker stated in his deposition that Plaintiff's employment was terminated because Plaintiff admitted to the conduct that violated business policy and was unapologetic about it. (Tucker Dep., Doc. 62-4 at 33:2–13.)  Thus, under the rule articulated in *Smith*, Defendants have been consistent with their reasoning because they have not offered new reasons for Plaintiff's firing and dropping the COVID-19 protocol violation could be considered a mere refinement.  Moreover, as noted previously, the Court has not considered the COVID-19 policy violations in its decision.

Therefore, the court concludes that Defendants terminated Plaintiff for legitimate non-discriminatory reasons, and that Plaintiff has failed to create a dispute of fact regarding pretext.

Accordingly, Defendants are entitled to summary judgment on Plaintiff's racial discrimination claims.

### C. Retaliation

#### 1. Adverse Employment Actions

Plaintiff claims he experienced two adverse employment actions.  The first adverse action was when he received two written warnings for absenteeism and violating Defendant's COVID-19 protocols.  (Doc. 62 at 29.)  The second adverse action was when Defendant terminated his employment.  (*Id.*)  Case law is clear that termination of employment is an adverse action because it is a significant change in employment status.  Sanchez v. Denver Pub. Sch., 164 F.3d 527, 532 (10th Cir. 1998).  Whether Plaintiff's receipt of two written warnings is an adverse employment action is less clear.  Plaintiff cites caselaw indicating that antiretaliation claims under Title VII and § 1981 prohibit a broader range of employer conduct. *Johnson v. Spirit Aerosystems, Inc.*, No. 20-CV-00138-GKF-CDL, 2022 WL 1174120, at *13 (N.D. Okla. Mar. 24, 2022).  Accordingly, instead of prohibiting just "adverse employment acts," antiretaliation prohibits "materially adverse actions," which encompass employer conduct that may dissuade an employee from attempting to report discriminatory conduct.  *See id.* (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).

However, Plaintiff fails to direct this court to evidence that the written warnings he received actually did or could have dissuaded him from attempting to make or support a charge of discrimination.  Instead, Plaintiff cites caselaw that states it is an objective, case-by-case inquiry whether an employer's conduct dissuaded an employee from reporting or filing charges of discrimination.  And while Plaintiff cites to caselaw that lays out the correct analytical framework for his claim, he fails to provide objective evidence for why receiving written warnings for (1)

failing to attend work, and (2) violating COVID-19 policies implemented to inhibit the spread of a novel/deadly virus may dissuade a reasonable person in Plaintiff's position from reporting discriminatory conduct.  Plaintiff's argument is conclusory, and thus, the court concludes that the only adverse action or materially adverse action Plaintiff experienced was the termination of his employment.

Additionally, the court does not address Plaintiff's theory of retaliation based on retaliatory harassment by co-workers.  (Doc. 69 at 23.)  The pre-trial order clearly articulates that Plaintiff's retaliatory claim is based upon Defendant's written warnings and termination of Plaintiff's employment: "Plaintiff was subjected to unwarranted discipline and was terminated in retaliation for engaging in protected activity . . . ." (Doc. 60 at 17.)  Because claims and issues that are not included in a pre-trial order are waived, *see Zenith Petroleum Corp. v. Steerman*, 656 F. App'x 885, 887 (10th Cir. 2016), Plaintiff cannot raise a new theory on which to base his retaliation claim.

Therefore, the only adverse employment action that can form the basis of Plaintiff's retaliation claims is the termination of his employment. Hence, the following retaliation claim analysis is based solely on Plaintiff's employment termination.

    *2.  Retaliation Claim Analysis*

Plaintiff brings a retaliation claim under § 1981 and Title VII.  Defendants claim the *McDonnell Douglas* framework applies to Plaintiff's retaliation claim because Plaintiff cannot demonstrate direct evidence of retaliation.  (Doc. 62 at 34.)  Plaintiff does not dispute the application of the *McDonnell Douglas* burden shifting framework and argues his retaliation claim under it.  (Doc. 69 at 23.)  Thus, the court will also apply the *McDonnell Douglas* framework to Plaintiff's retaliation claim.

To establish a prima facie case, Plaintiff must demonstrate (1) "that he engaged in protected opposition to discrimination," (2) "that a reasonable employee would have found the challenged action materially adverse," and (3) "that a causal connection exists between the protected activity and the materially adverse action." *Hansen v. SkyWest Airlines*, 844 F.3d 914, 925 (10th Cir. 2016) (quoting *EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 803 (10th Cir. 2007)).  If the plaintiff establishes a prima facie case of retaliation, the burden shifts back to the defendant to proffer a legitimate, non-discriminatory reasons for the adverse employment action.  *Glenn*, 2023 WL 3019661, at *9.  If the defendant offers a legitimate, nondiscriminatory reason, the burden shifts back to the plaintiff to establish that the defendant's proffered reason is pretextual.  *See id.*

Defendant does not dispute that Plaintiff has established a prima facie case of retaliation for the adverse action of terminating his employment.  Defendant offers the same reasons for Plaintiff's termination as it did for Plaintiff's Title VII and § 1981 racial discrimination claims. The court has already determined that Defendant's reasons for terminating Plaintiff were legitimate and not pretextual.  *See supra* Section III.B.  Thus, Defendant prevails in its motion for summary judgment on Plaintiff's retaliation claim.

### D.  Front and Back Pay Damages

Defendants also sought summary judgment on certain categories of damages.

The court need not decide this issue, however, because of the ruling on Plaintiff's claims.

### E.  Ash Grove Liability

Similarly, the court does not reach the issue of whether Plaintiff can bring his claims against both Fordyce and Ash Grove. Because the court has ruled in favor of Defendants on Plaintiff's Title VII and § 1981 hostile work environment, race discrimination, and retaliation claims, the

issue of whether Plaintiff may bring these claims against both Fordyce and Ash Grove is moot.

Thus, the court does not issue a decision on the parties' single or joint employer analysis.

## IV.   Conclusion

IT IS THEREFORE ORDERED BY THE COURT THAT Defendants' motion for summary judgment (Doc. 61) is GRANTED.

IT IS SO ORDERED.  Dated this 22nd day of December, 2023.

_____s/ John W. Broomes_____
JOHN W. BROOMES
UNITED STATES DISTRICT JUDGE
